Case No. 25-1763, Gene Latture, Appellant, v. Priority Life Care, LLC Mr. Branch, Deputy Appellant, Mr. Markey, Brady Ethel Good morning, may I please support? It's the senior moment when you forget that you have your glasses in your hands and you're looking for them. Good morning, my name is David Branch, I represent the appellant. This is an appeal from the District Court's grant of summary judgment and dismissal of claims under Title VII, Civil Rights Act 1964, and two common law claims. There are essentially three arguments that are going to be made this morning in support of this appeal. The first is that the District Court ignored direct evidence of racial discrimination and racial bias. Then the District Court improperly made credibility findings in reaching its decision. And finally, the District Court imposed pleadings, approved standards beyond those required by the law. Let's start, if I may, with the Hospital Work Environment Claim. Excuse me. Do you want some water? Yes. Oh, my God. The District Court adopted my friend and colleague's arguments on the Hospital Work Environment Claim, essentially accepting the claim, the appellee's argument, that the allegations made were not severe and pervasive, and for two reasons. The court concluded that some of the comments were not racial and other comments were not directed toward the appellant. As I count through the record, there are at least seven comments that are either racial or have racial implications. Shernigan, who was the supervisor, calling or telling my client that a co-worker was an ignorant, black bitch, and I note that even appellees were very concerned about even using that word or this phrase they resorted to using an acronym, IBB. But that's one comment. And then the supervisor also said, at least I didn't call her the N-word. Someone else in the workplace referring to blacks as ghetto blacks and hood rats, and the court is aware of the facts. My client was a director of marketing for a building that was being filled by residents or they were attempting to get residents to move into this building in Southeast D.C., so that was the third comment or fourth comment, hood rats. Another supervisor, in fact, the person who was responsible for the termination, referring to African-American men as a pack of animals and monkeys. Another person in the workplace reported that an African-American female that she encountered had a bad smell and she smelled like the V-word or slang for the V-word. And then another employee stating, what's wrong with these people? They live in the ghetto. Don't they want better? Don't they want anything better than living in the ghetto? So there's direct evidence of discrimination, and this aligns with this court's decision. On a Yisi et al v. Fannie Mae, this court seemed to believe or took the position that because these comments were not directly tied to an employment action, that these were actually straight comments. And this is maybe one of the most egregious cases of discrimination, short of calling someone the N-word. They did everything but calling this person the N-word, and all of it was done in her presence. And this is the work environment that she's working in, and she's an African-American director working in this position. So we believe the district court erred in concluding that these comments were not severe or pervasive. These are comments that were made over a period of six months. She began employment in January 2021, terminated in August of 2021. So that's the first point on the hostile work environment claim. For the despair treatment claim, we believe that claim the district court erred there as well, specifically with the despair treatment. She establishes the prima facie case, and the law in this circuit said once someone establishes the prima facie case, which is African-American female, I think she was 62 years old at the time, she was terminated from her position, placed on a PIP first and terminated, and she met all the elements of a prima facie case. So the next step just becomes whether there is sufficient evidence in the record that a jury Just with the hostile work environment claim, I don't think that this case was cited in the briefing, but there's a case from our circuit, Baloch v. I'm not sure I'm pronouncing it right. It's B-A-L-O-C-H v. Kempthorne, where we affirm summary judgment against a plaintiff in a hostile work environment case. And in part, we relied on the fact that comments weren't directed at the plaintiff. The racial comments weren't directed at the plaintiff. Can you point me to any case where racial comments were not directed at or about the plaintiff, and yet we have found that to be sufficient for a hostile work environment? Your Honor, I think the Baloch case can be distinguished by the work environment that's created here. I understand the court's position in terms of citing to a case where, you know, the comments aren't made directly to the person. But if you look at the volume of the comments here, we had, as I just cited, you know, seven instances of comments made directly to her in the work environment, where she essentially says, your colleague is an ignorant black bitch, or, you know, calling the colleague an ignorant black bitch, all of the other racial comments. There's nothing that compares to the facts in this case in Baloch. Okay. But as far as any case where the statements weren't made about the plaintiff, do you have any precedent where we found hostile work environment under those circumstances? Your Honor, I have not. But that can't be the sole basis for a hostile work environment, that someone has to make comments directly about the plaintiff. Particularly when you're dealing with a very short period of time, you have these comments essentially on a day-to-day basis, where the supervisor is making disparaging comments about African Americans. Everyone in the office, apparently, is making disparaging comments about African Americans, insulting the intelligence of an African American coworker. I don't have a case to cite that, but, Your Honor, if that needs to be expanded, I think this should be the case where the court considers expanding that, if someone creates an overall hostile work environment. I don't know what else you can describe this as. I don't know many places where you have to go to work and sit down, and your supervisor says, your coworker is an ignorant black bitch. Or, you know, all the other racial comments that were just mentioned here. So that's for the hostile work environment. For the disparate treatment claim, once again, it begins with, once the prima facie case is established, the question is really whether there are facts in this case that a jury could conclude that this decision was racially motivated, or here it's racial, but because of the protected class. And we have this, based on, first, the hostile work environment that's created, where the managers are essentially saying, this is how I feel about African American, your African American colleagues, plus all of the African American people that we're servicing or that we're offering services to, that this is the ghetto and, you know, hood rats, all of these other comments. So it begins there with this foundation. This is the claim, this is racial discrimination, and then it goes from there to. But the way we analyze this is we look at, okay, you've made your prima facie case, but we don't really care about that anymore once we, once a legitimate non-discriminatory reason is proffered for the employment action. Here it was a termination. And they said unprofessionalism and insubordination. So then the question just becomes, is there sufficient evidence to send it to a jury that that was pretext? In my reading of the summary judgment opinion, and I took a look at the statement of undisputed fact and the response of the plaintiff to that, I didn't see where there was a dispute that the statements that they say were insubordinate and unprofessional around the time of August 9th. I didn't see anything in Ms. Latour's affidavit or in the statement that said that she did not make those comments. Your Honor, we provided an affidavit with her detailed statement of exactly what happened on that occasion and all the other... I'll tell you, I read it and I looked at it and specifically around, this is at J567 and 568, it's paragraphs 49 to 53, 54. And I don't see where she ever says, I didn't say any of those things that they said that I said. Okay. So, Your Honor, well, first, I understand the court's question in the context. Let me just place this in the context. First, the comment about black bitches made in June of 2021 by Jernigan. In July, Ms. Latour suddenly placed on a performance improvement plan. She was supposed to meet every week. The employer doesn't comply with its obligations. And then in September, she is being terminated. So we go from... There's a shifting articulation and that actually supports a claim of discrimination. Because first, there's a claim that you're going to be terminated because of your... The reason given for the termination on or about August 12th is insubordinate and unprofessional conduct. And it was based on this exchange that happened with two different supervisors on or about August 9th. And what I'm saying to you is for an at-will employee, that's sufficient grounds for termination. And what I'm saying to you is I don't see in the record where Ms. Latour said, I never said or did the things that they said that I did on August 9th that were unprofessional or insubordinate. Did I miss that? And if so, where is it? Your Honor, I will check in the record because I know that she specifically did not agree with this characterization of being unprofessional or insubordinate. I know that you submitted a counter statement of disputed fact that denied that paragraph. But it didn't cite anything in support of that denial, which our local rules require and the federal rules require precisely because at summary judgment, we are trying to determine whether there is evidence in dispute of a fact. And it can't just be that you file a pleading that says, oh, we dispute that fact. You got to point to something in the record. And there was nothing identified in the record. That's at JA 544. It's denied and it says the accusations are false and were manufactured to cause plaintiff's determination. No site. There is a site for the next thing that is denied. So she jumps out at me when I don't see a site. And then when I read her declaration and I don't see a denial. Your Honor, then I will check the record. What I was going to say is, yes, that's the reason that they gave for the determination. And she denies it. But before it was an allegation of poor performance. So in the course of one month, we go from an allegation of poor performance, which you're not selling these units in southeast D.C. where people have to come up with thousands of dollars in money to move in, to now we're terminating you because of allegedly because of. Well, I mean. Of conduct that happens at this. They are mutually exclusive. You can have concerns about an employee's performance and put them on a performance improvement plan. And then later there's an outburst that's unprofessional, and you decide that you're just going to fire them based on that. There was no unprofessional outburst. And that's what I'm getting at. They said that there was. And there's nothing in her declaration that says I didn't do that. So, Your Honor, what I was saying is that there was essentially a shift. She's in this position for six months without any of these allegations. And suddenly she makes an allegation against her supervisor or her supervisor makes this racial, racist comment. And then she's placed on a PIP, and she's going based on these subjective statements of what happened in this meeting, a determination is made that she should be terminated. And then when that decision is made, the person who makes the decision is soliciting comments from other folks to tell me, give me information to help me support this decision to terminate Ms. Latour. All of that's in the record. That's not disputed. If you present that to a jury, a jury could very easily find that this is true. What inference that's nefarious do you get from the deciding official saying, okay, what she says sounds like grounds for termination. Write down the statements, but I'm going to terminate her. There's nothing that says that the deciding official has to wait until they get the written statements to take action.  So I'm okay. What is the question, Your Honor? I didn't get the question. I mean, you're saying that all of what's in the record would cause a reasonable jury to believe that this was all manufactured.  And I'm saying, why? They said they told the deciding official what happened. The deciding official said, give me statements. And the deciding official maybe didn't even wait for the statements. They heard the accounts of what happened, and then they took action. But Gerardo is one of the folks who made some of the racial statements herself. Well, you might have a shooting match if your client had said, I never said those things on August the 9th. She did not. I didn't. She denied that. She denied the statement, Your Honor. Well, I don't see that in the record.  Does anyone have any other questions? One quick fact clarification. On the retaliation point, Ms. Latour objected to Jernigan's comment. It was Gerardo who made the decision to fire Latour, and Gerardo did not know that Latour had objected to Jernigan's comment.  Yes, Your Honor. But two points. Jernigan, first, the incident with Jernigan, we just discussed that where Jernigan made the comments. Jernigan feeds the narrative to Gerardo on why Ms. Latour should be terminated. So under, well, we cite to the Cass Paul theory that, okay, you have a non- even if she was non-discriminating, Gerardo, which she was not because she had made racial comments herself, but Jernigan definitely has an issue with the plaintiff, and she knows that the plaintiff is going to likely file some type of claim against her, and she moves forward. She's already made these racial comments. She moves forward with making comments to Gerardo to cause her termination. So under this, you know, we cite Cass Law. I think was that both of your points? Yes.  And just if I just may. So the same is true for the retaliation claim as well as the wrongful termination claim, where she alleged in her complaint that there was an effort to move residents in without the correct medical documentation, and she was terminated because of that. All right. Thank you. We'll give you a couple minutes. Good morning, Your Honors, and may it please the Court. My name is Jim Murphy. I represent Prior to Your Life Care, the appellee in this case. A quick background. I'll make five points and then answer any questions you may have. Before that, though, just for background, Prior to Your Life Care, if you have any questions, please feel free to reach out to me.  Prior to Your Life Care is a company based in Indiana and were contracted in, don't typically do business here in the District of Columbia, but were contracted in here to manage Livingston Place, the assisted living facility in Southeast D.C. that was opened where all the relevant events occurred. Excuse me. I want to focus on the termination decision, if I could. The analysis here, we believe, is guided by this Court's decision in the Brady case, wherein the focus really needs to be on whether or not the decision-maker, Ms. Gerardo, had an honest and reasonable belief that the plaintiff appellant had been subordinate and unprofessional. The honest and reasonable belief in this case was based on not only her own experience on these calls directly interacting with the appellant, but also from an e-mail and a series of events that preceded the e-mail exchange that is in the record. And this is all laid out, and it sounds like you're familiar with it, Your Honors, but there are three e-mails on the 11th, on the 11th that reflect the decision that was made here. The 8.45 a.m. from Ms. Jernigan alerting the two people at corporate as to the behavior on a group call and some other issues that preceded it with the response, and the 9.09 e-mail where she announces, I have made this decision. She makes a decision based upon the information she got from that 8.45 a.m. e-mail as well as her own experience. And we'd submit that she had an honest and reasonable belief that conduct had occurred based on particularly the loud and confrontational behavior that was And all this is laid out in a series of documents in the record, JA-442, JA-446, JA-448, JA-450, and JA-435. The other thing I would add here that I think should be taken into account is that a lot of the friction had to do with the fact that the appellant had not been adopting the various marketing protocols that the company required for all of its sales and marketing people facilities to utilize. And she had various reasons for not doing it, and that's in the record. But one of the things that she made very clear was that I don't have time for it. It's a waste of time. And in her own declaration, she says very clearly that she disagreed with these marketing protocols, they were ineffective, and she felt strongly that they should have been voided. These protocols were things that the corporate office used to be able to monitor the extent and progress of sales locally. And Ms. Latour resisted adopting them, and that was in the documentation that was On the hostile workplace issue, the comments were pretty awful. Can you just address that issue? Sure, sure. Well, we agree with the district court's opinion that it did not reach the severe and pervasive level. There were two things going on here, I think. Well, importantly, I would mention with respect to the termination, I'll tie them together, I promise, but with respect to the termination decision, okay, none of these comments were, I know one was said in front of or the plaintiff overheard them, but none of those comments were directed at the plaintiff, at her termination, at her employment, at her performance, okay? And the same thing is true with the statement that Ms. Jernigan supposedly made to Ashley Lawrence, okay? None of them were directed at the plaintiff herself, so, therefore, none of them have a connection to the ultimate termination decision. With respect to those comments, each of them is denied. The plaintiff's counsel took depositions in each of those individuals, and the individuals denied having made those statements. But that summary judgment, the district court can't make credibility findings if they didn't happen. We have to assume, taking everything in the light most favorable to the appellant, that they happened. And so based on that, should we send that claim to a jury? And so why isn't it a hostile work environment to hear racist comments repeatedly throughout the course of your employment, especially if they're directed at your race? And I was just trying to address your question, Judge Walker, about coming about that hostile work. I understand they're in dispute. There were some of these statements that the counsel talks about, you people, okay, or these people, those people. Those comments were made, if they were made, they were directed at the people in the community that the Party Life Care came to serve. It was a low-income housing facility. It was put where it was put in Ward 8 to be able to serve people in Ward 7 and Ward 8. So to the extent there was a reference to, why won't these people come here, why do they want to live outside if they want to come and live with us here in this facility, it was those people, these people, that's what it was referring to. It wasn't supposed to be aligned to race. Why, if we take everything in life most favorable to the plaintiff and give the plaintiff the benefit of all inferences, which is what we're supposed to do in summary judgment, why isn't it a fair inference that there was a racial aspect of it? If we, why couldn't a reasonable jury say, you know, I know what they meant by the people and that was racial? Why wouldn't that be a fair inference, a reasonable inference that a jury could make? I know you would argue that they shouldn't. As a matter of law, you would say you can't make that inference? I would say contextually, contextually in this case, that's not an inference that's supported. And suppose we disagree with you and we think that all of these statements, there's a reasonable inference that they are racial? Well, among other things, they were not. The statement one was made, allegedly made in the presence of the plaintiff, of course. The others were not made knowing that she could overhear or knowing that she was listening. She overheard them, she has said. She wasn't sure if the speakers knew she could hear.  And whether or not the statements, the comments in a hostile work environment case are directed at the plaintiff, it's critical to determine whether or not there was, you know, an intentional, you know, intentional conduct here. The other piece I would mention is that the plaintiff, the company did have a harassment policy, a hostile work environment policy, and it wasn't utilized. As your friend on the other side says, I mean, it can't be the case that there can never be a hostile work environment unless a comment is directed specifically at the plaintiff. That would be a strange rule. Well, under the present, and I believe that we've cited several of the cases, we believe our case is analogous to those where the high level, the high level, high standard, high bar for a hostile work environment here wasn't met in its totality. Well, let's take whatever the worst comment was. We don't have to repeat it, but just, whatever you think is the worst comment, imagine that that comment was made once a week for a year. Would that be a hostile work environment, not directed at the plaintiff, but made once a week? There would be, I'm stuck, I'm trying to imagine the situation in which it is repeated. Without the plaintiff, without the person knowing the plaintiff was present, or without knowing the plaintiff was there to hear it? Well, just imagine that the plaintiff could hear it. It wasn't directed to the plaintiff, but the plaintiff could hear it. I think if you're going to hold the company liable, there has to be some kind of intentionality to it. And if the statement is made without knowing that the individual is hearing it, there's no intentionality. They knew the plaintiff could hear it. It wasn't directed to the plaintiff, but they knew the plaintiff could hear it. And knowing, it could be, I can't say it could never be. I think that's the right answer. The last couple of points, I see I'm just a little bit over my time. But with respect to, we don't believe there's direct evidence of discrimination. We believe this is a stray remarks case. And in this case, and under Morris McCarthy and other precedent within the circuit, the stray remarks here do not ultimately support pretext because there's no connection between those remarks and the actual adverse action at issue. Also, I should mention with respect to the retaliation claims, the alleged protected activity occurred not in June, but at some point during the winter months between January and March, because the plaintiff testified at a deposition that it occurred when they were in the off-site location, which was during those months and before they moved into the assisted living facility in April 1. So that was something I wanted to point out. I don't believe the cat's paw theory applies here for one particular reason. With respect to the 8.25 a.m. e-mail, okay, the Supreme Court was very clear in the Staub decision that the supervisor who's supposedly providing the tainted bias on the decision, that that person must be acting with the intent to influence the adverse action. And in this case, and that's the general rule that was enunciated by the Supreme Court in the Staub case, we have a couple of court decisions outside of this jurisdiction which we can provide, which uphold that application to say, if the individual who made the statement, the supervisor, didn't in fact intend to influence this, know that a termination decision or whatever was being made, then in that case Staub would not apply. And that's the case with the 8.25 a.m. e-mail. With the latter written statements that were provided, they came in after the termination decision was made, so therefore they can't ultimately have proximate cause on the termination decision. Lastly, on with respect to ultimate bias in the termination decision, in the record, as you know, we indicated that the company by 18, 18 days after Plaintiff was terminated, hired her replacement, Brandon Webb, who was also of the same race. And under Murray V. Gilmore, 406F3708, that fact cuts strongly against any inference of discriminatory motive in the termination decision. Lastly, on, one more point, on the retaliation claim. I'm sorry. Over your time. Quickly, quickly. On the retaliation claim, Plaintiff, under Minter v. D.C., D.C. Circuit 2015, the authority in the circuit is that Plaintiff would need to show more than temporal proximity and knowledge here. And in this case, she had neither. We would submit. All right. Thank you. That's all we have. All right, Mr. Branch, you're out of time, but we'll give you two minutes. Thank you, Your Honor. Your Honor, I think the final point that was raised, that the appellee hired an African American male to work in Southeast D.C. in a high crime area, that actually undercuts their argument. Selling units to African Americans. They had previously hired Ms. Latour for this position. It comes as no surprise that they were specifically, specifically looked for an African American to work in this area, given the facts of this case. And so I think what's been suggested by defense counsel, just is not a healthier position at all. It's a forced position. The Katz-Paul theory applies specifically to Jernigan. She made the comment specifically to cause the termination of the appellant. And once again, on the racial comments, it's clear, at least we believe a jury could easily find, that the employer created a house-to-work environment based on the severity, the pervasiveness, and the egregious nature of the racial comments, the ignorant black bitch comment. That comment alone, according to the Assisi-Etaw case from the Court of Appeals, where the court says, where I think the gentleman was told, you're doing fine for a black man, or you're fortunate to be in this position as a black male. A comment like that alone can alter or change a work environment. That's what happened with this comment about your colleague being an ignorant black bitch. Thank you. All right. Thank you. We'll take the case under.
judges: Wilkins; Rao; Walker